**SACK & SACK, ESQS.**
Jonathan S. Sack, Esq. (JSS 1835)
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

RECEIVED
OCT 09 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

ELENA SCHIANO,

                                        Plaintiff,

          — against —

ABC, INC., and WALTER VAZQUEZ,
individually,

                                        Defendants.

---------------------------------------------------------x

1:07-CV-06489 (DC) (MHD)

ECF CASE

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, Elena Schiano (*"Schiano"* or *"Plaintiff"*) by her attorneys, Sack & Sack, Esqs., file the following First Amended Complaint against her former employer Defendant ABC, Inc. (*"ABC"*) and immediate supervisor and Walter Vazquez (*"Vazquez,"* together with ABC, *"Defendants"*).

Schiano, as and for her complaint, alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff complains that her former employer, ABC, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, ("*Title VII*") based upon her sex, female.

2.    Plaintiff further complains that Defendants engaged in the unlawful discrimination and retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation of New York State New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon her sex, female.

3.    Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendants.

4.    Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendants:

a.    Discriminated against her with respect to the terms, conditions and privileges of her employment on account of her sex, female, by providing a fabricated poor performance review without warning or justification; and

b.    Deprived Plaintiff of her employment rights in violation of federal and state law.

5.    On or about December 16, 2004, Plaintiff filed a timely Charge of Discrimination

2

with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 160-2005-00976.

6.    On or around November 6, 2006, the EEOC issued a "probable cause" Determination, which stated, *inter alia*, **"there is sufficient evidence to show that Charging Party was discriminated against on the basis of her sex, in violation of Title VII.    We further conclude that the Charging Party's medical condition and subsequent long term medical leave of absence was the direct result of the ongoing hostile work environment within the department."** (Exhibit "A")

7.    Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the EEOC on April 24, 2007.  (Exhibit "B")

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

9.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of their employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

3

10.   Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

## PARTIES

11.   Plaintiff is an individual who, at all times relevant to this Complaint, has resided and currently resides at 491 Eltingville Blvd, Staten Island, New York, in the County of Richmond.

12.   From June 1981 until her unlawful termination on July 2005, Plaintiff was employed by ABC.

13.   At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, *et seq.*, § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of her sex, female.

14.   At all times relevant to this Complaint, Defendant is a corporation licensed to do business in the State of New York, with offices located at 77 West 66th Street, New York, New York, County of New York.

15.   Defendant is one of the largest media conglomerates and the largest television broadcaster in the United States.

16.   At all times relevant herein, Defendant is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

17.   Defendant Vazquez is an individual who is currently employed at Defendant ABC

4

at the address of 77 West 66th Street, New York, New York, County of New York.

18.     At all relevant times herein, Defendant Vazquez was Plaintiff's supervisor and in a position to discriminate and retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

19.     At all relevant times herein, Defendant Vazquez is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

20.     At all relevant times herein, Defendant Vazquez was Plaintiff' supervisor and in a position to retaliate against Plaintiff in violation of NYSHRL and NYCHRL.

21.     At all relevant times herein, Defendant Vazquez is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory retaliation pursuant to NYSHRL and NYCHRL.

## FACTS

The claims set forth herein arise from the following set of facts:

**PLAINTIFF'S EMPLOYMENT HISTORY**

22.     For 22 years, Plaintiff has been employed in the carpenter's skilled construction trades, a profession that is made up of predominantly Caucasian males.

23.     In or about June 1981, Plaintiff, a single mother raising three children by herself, was hired by Defendant as its first woman carpenter in Defendant's Maintenance Carpentry Shop.

5

24.    From 1981 through 1999, Plaintiff enjoyed a harassment-free work environment, during which time all of her coworkers and supervisors were male.

25.    For example, at a job fair in 1996, ABC advertised Plaintiff as an example of a woman engaged in non-traditional employment.

26.    Furthermore, during that time, Claimant was a top-performing carpenter, keeping up with her male counterparts without criticism or discipline of any kind.

27.    In or about 1999, Walter Vazquez, the company's locksmith, was appointed as Chief Maintenance Carpenter.

28.    At that time Vazquez became Plaintiff's direct supervisor.

29.    From 1999, through Plaintiff's unlawful termination on or about July 2005, Vazquez took affirmative steps to discriminate Plaintiff and treat her differently than her male coworkers in respect of the terms, privileges and conditions of her employment, despite her hard-work, seniority, experience and acumen.

## PLAINTIFF SUFFERS DISCRIMINATION

### EXCLUSION FROM LUNCH

30.     Examples of discriminatory treatment of Plaintiff that commenced with and was exacerbated by Vazquez was over actions of male coworkers to exclude Plaintiff from the lunch room eating area.

31.     Beginning in about February 1999, around the time of Vazquez's tenure, the male carpenters adopted the practice of leaving a newspaper in the seating place at the group lunch table at which Plaintiff would sit, attempting to harass Plaintiff and exclude her from the all-male lunch table, simply because she was female.

32.     The intentions of the male carpenters were confirmed when another male came to sit at the table and the male coworkers would remove the newspaper so that the male carpenter could join them.

33.     However, when Plaintiff came to the lunch table, the male carpenters would not remove the newspaper.

34.     This harassing behavior by Plaintiff's male coworkers created a hostile work environment intended to intimidate and alienate Plaintiff.

35.     Plaintiff complained to Vazquez on at least two (2) occasions to intervene her behalf and alleviate the over hostile work environment created by the male coworkers.

36.     Vazquez refused to assist Plaintiff and respond to her complaints of hostile work

7

environment, telling Plaintiff, without apology, **"I do not think I should get involved."**

37.    When Plaintiff suggested that perhaps Vazquez could elicit the assistance from Peter Perillo, Assistant Manager of Facilities Service.  Vazquez abruptly responded to Plaintiff, **"I don't think he [Peter Perillo] wants to get involved either."**

38.    Plaintiff also attempted to elicit assistance from Perillo's supervisor, Gene Cannataro who was Director of Facilities Service, with no luck.

39.    As a result of the behavior of the male carpenters concerning lunch seating and the refusal by her immediate supervisors to take action, Plaintiff was forced to find alternate seating elsewhere outside of the lunch area, even though carpenters were required to eat their lunch in the designated lunch area.

40.    Schiano would eat her lunch in her locker room to avoid the obvious discrimination and humiliation.

41.    Vazquez threatened to write her up for not eating in the provided area, forcing Plantiff back into lunch room and further instigating the situation.

42.    In or about 1999, following her unanswered complaints to her supervisors, Plaintiff brought the actions of her male coworkers to the attention of Brendan Burke, Director of Human Resources.

43.    Burke met with Plaintiff, took copious notes and said that he would "look into the matter."

44.    ABC never investigated Plaintiff's claims for hostile work environment at that

time.  None of the male coworkers were disciplined or reprimanded as a result of their harassing conduct.  Rather, ABC replaced the lunch table with a larger lunch table, thereby alleviating the space problem concerning lunch seating but not alleviating the hostile work environment created by the male carpenters who were Plaintiff's coworkers

## DISCRIMINATION / HOSTILE WORK ENVIRONMENT

45.    In addition to the lunch incidents, other discriminatory actions undertaken by ABC and its employees against Plaintiff continued to mount as Plaintiff's complaints went unanswered and fell on deaf ears.

46.    On March 15, 2000, before her 8am shift, Vazquez advised Plaintiff that she had to attend a safety class in another building even though Plaintiff was already dressed in her work clothes.

47.    Seeing Plaintiff was in work clothes, Vazquez yelled at Plaintiff, **"Hurry up or you'll be late."**

48.    Plaintiff immediately went to the safety class in the location in the other building.

49.    When Plaintiff arrived at her safety class, she noticed there her co-worker, Vito Salerno, and other male coworkers were in street clothes, indicating that they had had advance notice of the safety class that Plaintiff did not have.

50.    On the lunch break later that day, Plaintiff went back to the carpenter shop and asked Vazquez if she could change into her street clothes.

51.    Vazquez denied Plaintiff's request until Plaintiff noted that all the male co-

9

workers were notified in advance and all had their street clothes on and ready to leave w straight from class.

52.     Only after Plaintiff complained of this disparate treatment did Vazquez finall relent.

## SYSTEMATIC DISCRIMINATION MOUNTS AGAINST PLAINTIFF – THE SOLE FEMALE CARPENTER

53.     In April 2000, there was a meeting scheduled with a union representative about issues under the collective bargaining agreement.

54.     On that day, Alex Bisoccia, the shop steward, was absent and Vazquez chose a substitute based upon seniority to attend in Bisoccia's stead.  Specifically, Vazquez instructed Pat Potestio, Assistant Chief Maintenance Carpenter, to attend the meeting (and not Salerno) in Bisoccia's place because **"Salerno is not senior enough."**

55.     Plaintiff, who was more senior than both Potestio and Salerno, was not selected to attend because of her gender.

56.     Other incidents of discrimination kept mounting, where Plaintiff was singled-out, excluded and picked-on by her supervisors solely because of her gender.

57.     These gender-based incidences were confirmed through comments made by Vazquez and others.

58.     In November 2000, Plaintiff was asked to perform a job assembling tall

bookcases in an office, which needed to be mounted on the wall.

59.     Plaintiff requested from Vazquez assistance in mounting the case on the wall and that he should send someone to assist her.

60.     Incredibly. Vazquez refused, telling Plaintiff, **"you should do it yourself. All the other guys do!"**

61.     In early 2001, Vazquez criticized Plaintiff for leaving early for a doctor appointment and asked Plaintiff to cancel.  Plaintiff knew that a male coworker, Alex Bisoccia, had left early on several previous occasions for doctor appointments and that Manny Martinez frequently came in late, both without criticism from Vazquez.

62.     Vazquez constantly singled-out Plaintiff for issues that were applicable to other male coworkers who were not singled-out.

63.     For example, in February 2002, Vazquez requested that Vito Salerno make sure that Plaintiff's union dues were paid up to date.

64.     At that time Plaintiff's union dues were a few months in arrears.  At that same time, however, Plaintiff's male co-worker, Mr. Grilio's dues were also in arrears – by over one year.  However, Mr. Grilio was never reprimanded by Vazquez to pay up his union dies.

65.     Time after time, Vazquez would make harassing comments, innuendo and remarks targeted at Plaintiff simply because she was a female.

66.     For example, in January 2003 Vazquez told Plaintiff that pursuant to a new policy, she could no longer wear a vest over her uniform.

11

67.    For many years, Plaintiff had worn a vest over her uniform because oftentimes Plaintiff's job required her to work in cold areas within a building or Plaintiff would walk from building to building on cold days.

68.    When Plaintiff inquired Vazquez about this new "policy", Vazquez told Plaintiff that, **"the reason for this new policy is that an executive from The Disney Company [ABC's parent company], had seen Plaintiff in her vest and made a remark about it."**

69.    Plaintiff did not receive any memo from ABC concerning the new policy, but nevertheless complied with Vazquez's order about the new "no-vest policy."

70.    Plaintiff, still skeptical about the new policy approached two male coworkers who worked in ABC's electric shop and who had worn vests for years.

71.    Plaintiff asked her male coworkers whether they had heard anything about a new no-vest policy.

72.    The two men told Plaintiff, **"We heard nothing about a no-vest policy."**

73.    Plaintiff, realizing that Vazquez had singled her out in enforcing a no-vest policy approached Peter Perillo, Assistant Director of Facilities Service, and told him, **"I have no problem complying with any company policy, but I believe that no policy was instituted and that Vazquez is once again imposing special rules and singling me out simply to harass me, the only female on the job."**

74.    Perillo told Plaintiff he would look into this new "policy."

12

75.     A few days passed when Perillo returned to Plaintiff and admitted that Vazquez had **"made up the whole story"** about the Disney executive.

76.     Only after Plaintiff complained to Perillo, and that Perillo realized that Plaintiff was being singled-out by Vazquez did a memo appear stating a new policy prohibiting wearing vests.

77.     This after-the-fact memo, is a poorly veiled attempt to cover-up Vazquez's harassing behavior.

78.     Plaintiff was disappointed that rather than discipline Vazquez for his sexual harassment of Plaintiff, Plaintiff's supervisors and her supervisors' supervisors make every attempt to cover-up and/or defend the harassing behavior Plaintiff was undergoing at the hands of her male bosses simply because she was female.

79.     Whenever there was an opportunity for Vazquez to pick-on and single-out Plaintiff, he seized it.

80.     In September 2003, ABC issued the carpenters new uniforms.

81.     For three days, Vazquez called, spoke to and yelled at Plaintiff concerning a pair of old uniform pants that she could not locate but needed to be turned in for her to receive the new uniform.

82.     Other male coworkers, who also could not locate parts of their old uniform, such as Salerno, who also missing a 2 pairs of pants and 2 shirts, and Potestio, who was issued two sets of new uniforms (14 pairs of new pants in all), were not spoken to, harassed, or disciplined for the same acts as Plaintiff.

13

---
**PLAINTIFF COMPLAINS SEVERAL TIMES TO ABC ABOUT THE HARASSMENT, TO NO AVAIL**
---

83.    In May 2001, shortly after Plaintiff was singled out for going to the doctor, she requested a meeting with Gene Cannataro, Director of Facilities Service, to discuss a written warning letter that she had received for excessive sick days.

84.    Plaintiff told Cannataro that the absences should not be deemed excessive because some were on consecutive days and related to the same illness. Plaintiff even provided a doctor's note confirming her illness. Plaintiff also argued others had excessive sick days and were not written up.

85.    Cannataro replied, **"Do not compare yourself to them."** Cannataro criticized Plaintiff for her many complaints to Human Resources complaining of sex discrimination within the department.

86.    Vito Salerno, the Shop Steward, was present at this meeting.

87.    Plaintiff was extremely disappointed by Cannataro's response to Plaintiff's legitimate complaint of sex discrimination. Rather than alleviate the issues that Plaintiff was raising with her superiors, they intimidated her and denied that she was suffering any form of discrimination.

88.    Cannataro, who was a director of Facilities Services, as a supervisor at ABC with the authority, ability and powered conferred to him by ABC to hire, fire, promote, demote and transfer employees such as Plaintiff, should have known better than to condone or deny

14

Plaintiff's complaints of discrimination.

89.    Following Cannataro's inaction, Plaintiff complained to Brendan Burke, Director of Human Resources about retaliation and Cannataro's response to Plaintiff's complaints .

90.    Salerno, who was present at the Cannataro meeting with Plaintiff, did not back up Plaintiff's story.  Salerno later admitted to Plaintiff that, **"I am not going to speak against a director, sorry."**

91.    Burke later reported back to Plaintiff that he had spoken to Cannataro and had not found that anything inappropriate had occurred.

92.    As a result of Burke's conclusion, Plaintiff determined that reporting such conduct to Human Resources would not be helpful to her.  Plaintiff perceived that her complaint to Burke had done her more harm than good, by angering her supervisors and feared that she would be retaliated against for such complaints; and she was.

93.    As the harassment by Plaintiff's male coworkers and supervisors became increasingly consistent without help, assistance or guidance from her supervisors or supervisors' supervisors, Plaintiff began consulting with ABC's doctor, Dr. Dorf, because she was so upset about how she was begin treated by Vazquez.

94.    Plaintiff confided to Dr. Dorf that that Vazquez was "harassing her again."

15

> **NOVEMBER 5, 2003 — THE BEGINNING OF THE END**

95.    By November 2003, Defendants' discrimination of Plaintiff has become so prevalent and constant that almost every aspect of Plaintiff's employment was affected by Defendants' discriminatory conduct and the treatment by Defendants of the female carpenter at ABC was accepted and spilled over into other forms of discrimination – namely discrimination against Plaintiff for her need to take family leave to care for her pregnant (and ill) daughter, Dawn.

96.    In or about early November 2003, Plaintiff's pregnant daughter Dawn, was suffering from complication from her pregnancy, specifically, gestational diabetes.

97.    As Dawn's due date grew closer, Plaintiff approached Vazquez and informed him that she might have to leave to go to the hospital at any time.

98.    Under FMLA, Plaintiff must be afforded that right to tend to her sick family member, in this instance, her daughter.

99.    Plaintiff told Vazquez that as soon as her daughter would go into labor, she would need to take time to care for Dawn.

100.    Plaintiff's daughter was a single mother and it was important to Plaintiff (and her two other children) to be there for her, and because of the complications with the pregnancy it was a matter of extreme family concern.

101.    On November 5, 2003, Plaintiff received calls from her other children, Robert and

Toni-ann, advising Plaintiff that her daughter had gone into labor and was in the hospital.

102.    In her urgency to tend to her daughter, Plaintiff could not locate Vazquez but asked Salerno to inform Vazquez that she had left for the hospital and would call in later. Plaintiff was extremely nervous about her daughter and very concerned.

103.    On her way out of work that day in a race to Methodist Hospital, Plaintiff saw Vazquez, who angrily asked her, **"Where do you think you're going?"**

104.    Plaintiff reminded Vazquez of her pregnant daughter and told him that she had received emergency calls to go to the hospital.

105.    Plaintiff was sweating, flushed and nervous about her daughter's condition and believed that Vazquez would understand the urgency for her to rush to Dawn's aid.

106.    Instead, Vazquez tried to prevent her from leaving the building.

107.    Vazquez angrily asked Plaintiff, **"Is this going to be personal day or a vacation day?"**

108.    Plaintiff could not believe that in her time of urgency in a rush to go to a hospital, Vazquez was more concerned whether Plaintiff was taking a personal day or sick day rather than encouraging Plaintiff to hurry to her daughter and worry about the administrative handling of Plaintiff's absence.

109.    Plaintiff, who was very distracted by her need to get to the hospital quickly, could not focus on whether she would take the time as "personal time" or "sick time" did not respond and hurried to the hospital.

110.    As she ran passed Vazquez, he warned her to call him with her answer.

111.    In her more than 20 years at ABC, Plaintiff never heard a male coworker questioned about his need to tend to sick family members.  Plaintiff wept on the way to the hospital as a result of Vazquez's insensitive, harassing and belligerent behavior towards her during a family emergency.

112.    Later that day, November 5, 2003, Plaintiff's daughter Dawn, gave birth to a baby boy.

113.    On that same day, Plaintiff had her other daughter, Toni-ann, call Vazquez and inform him that Plaintiff was taking a personal day.

114.    On November 6, 2003, immediately following the birth of her grandson, Plaintiff returned to work.

115.    On November 7, 2003, nervous about an inevitable confrontation with Vazquez concerning her rush to the Hospital to tend to her daughter, Plaintiff became ill with symptoms that included heart racing, shaking, sweating and terrible headaches.

116.    When a concerned coworker asked Plaintiff if she were ill, Plaintiff paid a visit to Dr. Dorf, ABC's in-house doctor.

117.    Plaintiff described to Dr. Dorf the incident with Vazquez just two days earlier and that she was sick over his behavior towards her.

118.    Upon hearing of Plaintiff's incidences with Vazquez, Dr. Dorf's assistant called Vazquez and informed him that Dr. Dorf was sending Plaintiff home due to work-related stress.

119.    Shortly thereafter, Dr. Dorf telephoned Plaintiff's personal physician, Dr. Evelyn

18

Goldstein, and informed her of the serious work-related stress Plaintiff was suffering at the hands of her male supervisor, Vazquez.

120.    As soon as Plaintiff returned to the shop, Vazquez approached her nose-to-nose, and in a nasty tone asked her, **"So Elena you are sick?"**

121.    Trying to manage the situation and avoid a confrontation, Plaintiff did not respond and instead made her way towards the locker room to change into her street clothes.

122.    Vazquez followed her, and banged repeatedly and forcefully on the women's locker room door ordering her to open the door.

123.    A sobbing Plaintiff told Vazquez that she was changing her clothes.

124.    Vazquez told Plaintiff, **"I am going to wait outside for you."**

125.    Plaintiff, in between sobs, pleaded with Vazquez, **"Please leave me alone. I am not well and I need some time to recover."**

126.    When Plaintiff finally exited the locker room, a waiting Vazquez asked her to give him her "work tickets," which are the requisition slips for the jobs to be performed by her, even though he already had a copy.

127.    Plaintiff gave them to him and immediately returned home.

128.    On November 8, 2003, the very next day, Plaintiff saw her personal doctor and, for the first time in her life, was given medication for anxiety.

129.    At that time, Plaintiff was instructed to stay at home for at least one week.

19

130.    On November 10, 2003, Plaintiff's daughter Toni Ann called Perillo to notify him that her mother was out of work on doctor's orders.

131.    Perillo told her that there had been an incident between her mother and Vazquez, as well as other problems in the past.

132.    Upon hearing of these incidents, Toni-ann was obviously very concerned, and she offered to go to ABC to speak with Perillo about the situation.

133.    He did not take her up on her offer, and he never called her back to do so.

134.    Even more disturbing was Perillo's admissions that there had been admitted problems between Vazquez and Plaintiff and they went unresolved, resulting in Plaintiff's suffering of severe anxiety.

135.    In or about the first week of December, 2003, Plaintiff returned to work.

136.    Upon her return, Perillo asked her for her version of the events of the November 7, 2003 incident.

137.    After Plaintiff explained to Perillo what had happened, Perillo told Plaintiff that she had had an outburst of yelling, screaming and crying at Vazquez.

138.    A surprised Plaintiff told Perillo that she remembered no such thing, and recounted the events of that day and the days that followed.

139.    Vazquez was never warned, disciplined, reprimanded or even spoken to about the recent egregious incidences committed by him as complained of by Plaintiff.

> ### RETALIATION
> BLAMING THE VICTIM -- ABC DISCIPLINES PLAINTIFF!

140.   On or about January 23, 2004, two (2) months following the November 7 incident, in utter shock to Plaintiff, Plaintiff was given a written warning for the events that transpired incident of November 7.

141.   Plaintiff was incredibly disappointed and dismayed to learn that ABC would resolve Plaintiff's complaints of ongoing sex discrimination by her supervisor Vazquez by retaliating against her and disciplining her for taking sick leave to tend to the emergency care of her daughter at the end of a complicated pregnancy.

142.   The January 23, 2004 warning is both inaccurate and untrue.

143.   The author, Peter Perillo, manipulated witness statements to create "trumped up" charges against Plaintiff.

144.   Specifically, according to Perillo's own notes concerning the November 7, 2003 incident, Ruby Sykes never told Perillo that Plaintiff said she was going to **"fuck them all up"** on November 7, 2003.

145.   This inaccuracy, and other baseless accusations made in the January 23, 2004 warning letter were extremely upsetting to Plaintiff and confirmed that she was being "set-up" in retaliation for her prior lawful complaints.

146.   Perillo insisted that Plaintiff sign the warning letter, and did so at the direction of

shop steward Vito Salerno.

147.   Plaintiff did not agree with the rendition of facts recounted by her male supervisors and the male supervisors' supervisors.

148.   At that time, Plaintiff requested from Burke of human resources a copy of her employee file that contained her ongoing complaints of discrimination from Vazquez dating back to 1999, but Burke told her that there was nothing in it.

149.   Plaintiff reminded Burke of the many complaints she had made to him over the years about Vazquez's discriminatory and harassing treatment of her, and how he had taken notes during their meetings, and that he said he would look into it and make copies for her. Burke told Plaintiff he would **"check again."**

150.   When Plaintiff returned to Burke five days later, he advised her that he had no notes (and was not permitted to give them to her, in any case).

151.   On February 4, 2004, George DiLacio of Carpenters Union local 157 came to meet with Plaintiff and told her that he was going to begin investigating why Plaintiff's numerous complaints of harassment and discrimination had gone unanswered for so long.

152.   DiLacio met with Salerno and reprimanded him, asking why he did not try to help Plaintiff during the three years of feeling harassed and discriminated against.  DiLacio further told Salerno that he never should have let Plaintiff sign the warning letter.

153.   DiLacio then met with Vazquez and asked why she had been written up in January for something that had purportedly occurred two months before and only after Plaintiff returned to work and complained about the Vazquez's actions and behavior.

22

154.   Vazquez responded that he would have to ask Perillo and it was agreed that a meeting would be set up to discuss the incidences of discrimination and harassment leading up to the November 7 incident.

155.   Shortly thereafter, and before the meeting, DiLacio went out on disability and Plaintiff never spoke with him again.

156.   No meeting was ever set up until weeks later while discriminating and harassing conduct continued to occur.

## CONTINUED RETALIATION
## PLAINTIFF'S SUPERVISORS TURN UP THE HEAT

157.   Following DiLacio's involvement in Plaintiff's complaints of harassment, Vazquez boldly continued to harass Plaintiff and turn her other male coworkers against Plaintiff in attempts to force Plaintiff to quit thereby finally removing the thorn in his side.

158.   For example, until February 2004, the carpenters at ABC had always been permitted to use the telephone for personal calls during their lunch hour and coffee breaks.

159.   In February 2004 Vazquez took away telephone privileges for all the carpenters, saying that he was doing so because **"Elena had been using the phone during work time."**

160.   There was no basis for Vazquez's accusations.  Plaintiff was never warned, reprimanded or disciplined for using the telephone during work time.

23

161.    Vazquez's accusations was an obvious ploy intended to make the other carpenters angry with Plaintiff.  Plaintiff went to see Perillo about the situation.

162.    Plaintiff told Perillo that if he pulled the telephone records it would prove that she was not using the phone any more than anyone else.

163.    Plaintiff further told Perillo that the removal of phone privileges was in retaliation for her going to the union about the disciplinary warning against her.

164.    Perillo candidly admitted to Plaintiff, **"Don't think that I didn't think of that."**

165.    Nevertheless, the phone records were not consulted and there was never any evidence that Plaintiff had misused the phone.

166.    Consequently, the phone privileges were restored the next day, but the damage had been done.

167.    Despite Perillo's admission, Vazquez was never disciplined, warned or reprimanded for his erratic and unlawful behavior towards Plaintiff (although Plaintiff was never aware of any disciplinary action, EEOC investigation surfaced proof that Vazquez was disciplined for the retaliatory act of removing phone privileges and blaming Plaintiff as cause).

## "MAYBE BECAUSE THERE IS A WOMAN HERE"

168.    On March 9, 2004, Joe Calciano from the Carpenters Union came to the shop and addressed Plaintiff's entire department.

169.    Present were Vazquez, the chief maintenance carpenter, Pat Potestio who was assistant chief maintenance carpenter, Manny Martinez, Alex Bisoccia, James Budd, Vito Salerno, and Plaintiff.

170.    Calciano talked to the group about how it was important that everyone should try to get along and to respect one another.

171.    Potestio replied: **"Other shops do not have problems and ours does… and maybe because there is a woman here… maybe she hates men."**

172.    Shocked by her coworker's comments, Plaintiff asked Potestio, **"who are you talking about?"**

173.    Potestio replied in front of the group, **"You, Elena."**

174.    Silence befell the entire room.    No one replied to Potestio's publicly discriminatory comments, not even Potestio's superior, Vazquez.

175.    Following these publicly humiliating comments, Plaintiff's allegations are confirmed: the male carpenters at ABC resented Plaintiff for no other legitimate business reason other than the fact that she is a female.

176.    Instead, Budd agreed with Potestio complaining that it was Plaintiff's fault that

25

the phone privileges had been taken away.

177.   Plaintiff later requested the minutes from this meeting, but they were not provided to her.

178.   It was obvious to Plaintiff that all the men would stand together against her and were determined to be rid of the only female carpenter in their group.

## PLAINTIFF SUFFERS DISCRIMINATORY AND TERMINATION

179.   On or about March 15, 2004, several days following Calicano's meeting, Perillo requested a meeting with Plaintiff to discuss **"what is going on in the shop."**

180.   Plaintiff asked Perillo to tell her what the issues were that would be discussed, and Perillo refused to do so.  Plaintiff informed Perillo that she was not comfortable being at such a meeting, but he told her it was mandatory.

181.   Plaintiff was somewhat relieved as she thought the upcoming meeting would be used to resolve the blatant and public incidences of discrimination and harassment she was suffering at the hands of her supervisors and coworkers.

182.   On or about March 17, 2004, a meeting was held with Perillo, labor relations counsel David Silberman, and three representatives of the union who had apparently been requested to attend by Perillo (Fred Kennedy, Business Representative, Lawrence D'Errico, Organizer Representative, and Danny DeMorato, Business Representative.)

183.   Perillo denied Plaintiff's requests to meet with her own union representatives prior to the March 17th meeting.

26

184.    The union representatives asked Silberman to leave, since they had not brought a lawyer.

185.    At the meeting, Perillo asked Plaintiff for the first time if she remembered saying to Pat Potestio that she **"had a bullet for him and a bullet for Tom Been."** (Been is another manager in the Facilities department.)

186.    Plaintiff was completely shocked to hear such a false accusation by a male assistant supervisor, especially since she believed the purpose of the meeting was to alleviate the concerns of discrimination and harassment, not to add to the false and pretextual accusations dreamed up by Plaintiff's supervisors and coworkers looking to see her fired.

187.    Plaintiff adamantly denied ever making such a comment.  Plaintiff then asked when it was claimed that she had said this.

188.    Perillo responded that it occurred in June 2003, almost nine (9) months ago.

189.    One of the union representatives jumped up and said, **"That was 9 months ago, why would you ask now?'**

190.    Plaintiff asked when Potestio had come forward with this false accusation and Perillo replied **"March 10."**

191.    Not surprisingly, March 10th is the day immediately following the March 9th Meeting where Potestio publicly made the comment, **"Other shops do not have problems and ours does… and maybe because there is a woman here… maybe she hates men."**

192.    Plaintiff asked Perillo why he thought Potestio had suddenly come forward now, almost a year later and Perillo said that Potestio **"Just felt that he needed to."**

193.    Perillo's response is admittedly false.    In fact, according to Perillo himself, Potestio admitted that he made this accusation against Plaintiff on March 10th because he wanted to protect himself against any future actions Plaintiff would bring against him for his publicly-made chauvinistic and discriminatory comments.

194.    Just then, Gene Cannataro entered the room, introduced himself to the union representatives but ignored Plaintiff.

195.    At that time, in a total unorthodox fashion, Cannataro told the union representatives, **"If she gets out [of the room], I will tell you the whole story."**

196.    Plaintiff was shocked and in disbelief that she was asked to leave an investigatory meeting surrounding false accusations against her.

197.    The union representatives asked Plaintiff to leave and she did so in the belief that the union representatives had her best interests in mind.

198.    On her way out the door, Cannataro told Plaintiff, **"And don't stand next to the door."**

199.    Plaintiff felt humiliated, betrayed, sick and embarrassed by Cannataro's treatment of her.

200.    Plaintiff felt helpless as she had been ambushed with an outrageous accusation, in a meeting with all men, and now found herself out in the dark while the men who harassed her

28

discussed her situation inside.

201.    At that moment, standing outside the meeting door while the fate of her job was discussed inside, Plaintiff broke down and began crying hysterically, banging her head against the wall.

202.    Mr. Aponte's secretary, who witnessed Plaintiff's break-down, telephoned Plaintiff's son, Robert, who works in Manhattan, and told him that he had better come and get his mother.

203.    A short time later Robert arrived in the building lobby at 47 West 66th Street. He wanted to get his mother and take her home. Unfortunately, Robert had to wait in the lobby for over an hour because the men upstairs would not let Plaintiff leave.

204.    While he was waiting, a male employee from outside Plaintiff's department introduced himself as Matty, told Robert, **"What they are doing to your mother is wrong!"**

205.    Upstairs, the men could see that Plaintiff was upset and now physically ill, but they would not let her leave.

206.    Instead, after at least forty-five minutes had passed, they summoned her back into the meeting.

207.    When Plaintiff returned to the meeting she tried to tell the men in the room about the remark that Potestio had made on March 9. She also tried to explain that his complaints of March 10 are extremely suspect since nobody complained of such comment that occurred a year earlier until after the March 9th meeting. At that time, Plaintiff also informed the men that there

were six other employees in the room on March 9 when Potestio had made the statement, and that word had gotten around to other employees in the company about what Potestio had said.

208.    Perillo waved his hands in Plaintiff's face dismissed Plaintiff's claims, and told Plaintiff that, **"You are going to be written up, and that any further incident would be grounds for dismissal."**

209.    Following his comments, Perillo permitted Plaintiff to leave, and, now completely distraught, she went to the lobby and Robert took her home.

210.    March 17, 2004 was Plaintiff's last day at ABC.

211.    Since that time, Plaintiff has been on disability leave.

212.    In November 2004, Cannataro notified her that her position had been filled and accordingly, Plaintiff had been terminated without justification, reason, notice or cause and in retaliation of her complaints of egregious ongoing discrimination and harassment as a result of her gender, female.

213.    Cannataro told Plaintiff, **"When you are able to return to work you should contact HR to explore any possible employment with ABC. Hope you are on the road to recovery."**

214.    Plaintiff later learned that a personal friend of Vazquez's filled her position at ABC.

215.    It is obvious that pushing out women and replacing them with men who are personal friends is cronyism and is the essence of unlawful discrimination.

216.   No disciplinary action was ever taken with respect to Potestio, and that ABC never investigated Potestio's conduct on March 9 while it considered the allegations he made against Plaintiff the very next day.

217.   Accordingly, in July 2005, Plaintiff was singled out and unlawfully terminated from ABC without any reason, notice, justification or cause except in retaliation of her lawful complaints concerning discrimination by Defendants on the basis of Plaintiff's gender.

218.   At the end of a comprehensive investigation, the EEOC made the following findings, **"There is sufficient evidence to show that Charging Party was discriminated against on the basis of her sex, in violation of Title VII. We further conclude that the Charging Party's medical condition and subsequent long term medical leave of absence was the direct result of the ongoing hostile work environment within the department."** (Exhibit "A")

219.   There is no legitimate business justification for such targeting and persecution of Plaintiff to exist at ABC by Plaintiff's supervisor, Vazquez and others.  Such debilitating and discriminatory behavior did not further the business of ABC.

220.   Furthermore, prior to the commencement of this action, Plaintiff served a copy of this Complaint to the following persons at the last known address set forth in accordance with the New York City Administrative Code § 8-502(c):

Corporation Counsel of New York City
100 Church Street, Room 4313
New York, New York 10007

NYC Commission on Human Rights
40 Rector Street, 9th Floor
New York, New York 10006

## LEGAL CLAIMS

### AS AND FOR A FIRST CAUSE OF ACTION

SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
42 U.S.C.A. § 2000e

221.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

222.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's sex, female, and show an animus of sex bias.

223.    Defendants' animus towards Plaintiff's sex is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

224.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

225.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

226.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

227.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in

32

retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

228.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

229.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

230.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

231.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

232.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

233.    In committing the acts alleged herein, Defendants, jointly and severally,  acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton

33

disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000E

234.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

235.    Based upon the aforementioned facts, Plaintiff was subjected to discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments and discussions.

236.    Defendants' knowledge, tolerance and acquiescence of a sexually charged hostile work environment suffered by Plaintiff, is impermissible sex based discrimination.

237.    Defendants allow to exist an offensive, discriminatory, and hostile work environment where a constant barrage of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments and discussions was made, which is particularly offensive and directed towards Plaintiff.

238.    Defendants did not have policies in place to deal with a sexually hostile work environment or did not adhere to those policies if they were indeed in place.

34

239.    Defendants failed to take reasonable steps to stop the harassment complained of herein.

240.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

241.    These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

242.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

243.    The aforementioned acts of Defendants constitute hostile work environment sexual harassment against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

244.    As a proximate result of Defendants' aforementioned hostile work environment sexual harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

245.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

246.    As a further proximate result of Defendants' hostile work environment sexual harassment, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

247.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

248.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

249.    In committing the acts alleged herein, Defendants, jointly and severally,  acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A THIRD CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

250.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

251.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

252.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of her terms, conditions, and privileges of employment.

253.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

254.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

255.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

256.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

257.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

258.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than

9%.

259.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

260.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT UNDER NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

261.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

262.    Based upon the aforementioned facts, Plaintiff was subjected to discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments and discussions.

263.    Defendants' knowledge, tolerance and acquiescence of a sexually charged hostile work environment suffered by Plaintiff, is impermissible sex based discrimination.

264.    Defendants allow to exist an offensive, discriminatory, and hostile work

38

environment where a constant barrage of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact and sexual advances was made, which is particularly offensive and directed towards Plaintiff.

265.   Defendants did not have policies in place to deal with a sexually hostile work environment or did not adhere to those policies if they were indeed in place.

266.   Defendants failed to take reasonable steps to stop the harassment complained of herein.

267.   As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

268.   The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

269.   As a proximate result of Defendants' aforementioned hostile work environment sexual harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

270.   As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

271.   As a further proximate result of Defendants' actions taken because of Plaintiff's

sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

272.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

273.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

274.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A FIFTH CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

275.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

276.    Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias.

277.    Defendants' animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

278.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

279.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

280.    As a proximate result of Defendants' aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

281.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

282.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

283.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants,

jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

284.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

285.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT UNDER NEW YORK CITY HUMAN RIGHTS LAW § 8-107

286.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

287.    Based upon the aforementioned facts, Plaintiff was subjected to discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments and discussions.

288.    Defendants' knowledge, tolerance and acquiescence of a sexually charged hostile work environment suffered by Plaintiff, is impermissible sex based discrimination.

289.    Defendants allow to exist an offensive, discriminatory, and hostile work environment where a constant barrage of discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments and discussions was made, which is particularly offensive and directed towards Plaintiff.

290.    Defendants did not have policies in place to deal with a sexually hostile work environment or did not adhere to those policies if they were indeed in place.

291.    Defendants failed to take reasonable steps to stop the harassment complained of herein.

292.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

293.    The aforementioned acts of Defendants constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

294.    As a proximate result of Defendants' aforementioned hostile work environment sexual harassment against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

295.    As a further proximate result of Defendants' actions, Plaintiff has and will

43

continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

296.   As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

297.   As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

298.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

299.   In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000e

300.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

301.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

302.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

303.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

304.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating her employment.

305.    Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

306.    The aforementioned acts of Defendants constitute unlawful retaliation against

Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

307.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

308.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

309.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

310.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

311.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

312.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

46

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

313.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

314.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYSHRL § 296 (1) (a).

315.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

316.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

317.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating her employment.

47

318.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

319.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

320.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

321.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

322.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

323.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

324.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

325.   In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A NINTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107

326.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

327.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendants were engaged in unlawful conduct under NYCHRL § 8-107.

328.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

329.   Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate authorities, including the EEOC.

330.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendants and appropriate

authorities, including the EEOC, Defendants engaged in adverse treatment of Plaintiff, including, *inter alia*, terminating her employment.

331.    As a result of Defendants' actions, Plaintiff is unable to return to comparable employment.

332.    The aforementioned acts of Defendants constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

333.    As a proximate result of Defendants' aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

334.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

335.    As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

336.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

337.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less

than $3,000,000.00 in compensatory damages from Defendants, jointly and severally, in addition to all other amounts sought herein.

338.    In committing the acts alleged herein, Defendants acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants, jointly and severally, and to deter Defendants from continuing and repeating such conduct in the future.

## AS AND FOR A TENTH CAUSE OF ACTION

### AGAINST VAZQUEZ (NYSHRL - AIDING AND ABETTING)

339.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

340.    As a result of the aforementioned actions, Defendant Vazquez has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York Executive Law § 290 et seq.

341.    As a result of the aforementioned actions, Defendant Vazquez has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

51

342.    As a result of Defendant Vazquez's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### AGAINST VAZQUEZ (NYCHRL - AIDING AND ABETTING)

343.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

344.    As a result of the aforementioned actions, Defendant Vazquez has discriminated against Plaintiff on account of her gender with respect to the terms, conditions and privileges of her employment in violation of New York City Administrative Code § 8-101 et seq.

345.    As a result of the aforementioned actions, Defendant Vazquez has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

346.    As a result of Defendant Vazquez's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## ATTORNEY'S FEES AND COSTS

347.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

348.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.    An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%;

II.    An award of compensatory damages not less than $3,000,000.00;

III.    An award of punitive damages not less than $3,000,000.00;

IV.    An order enjoining Defendant from engaging in the wrongful practices alleged

herein;

V.      An award of prejudgment interest, costs and attorney's fees; and

VI.     Such other and further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated:      New York, New York
            September 21, 2007

                    Respectfully submitted,

                    **SACK & SACK, ESQS.**

            By: _____
                    Jonathan Sack, Esq.  (JSS 1835)

            **Attorneys for Plaintiff**
            **ELENA SCHIANO**
            110 East 59th Street, 19th Floor
            New York, New York 10022
            Tel.: (212) 702-9000
            Fax: (212) 702-9702

54

Exhibit A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625

Spencer H. Lewis, Jr.
District Director

Charge Number 160-2005-00976

Elena Schiano                                    **Charging Party**
491 Eltingville Blvd.
Staten Island, New York 10312

vs.

ABC, Inc.
77 West 66th Street
New York, New York 10023              **Respondent**

## DETERMINATION

On behalf of the Commission, I issue the following determination on the merits of the subject charge filed under Title VII of the 1964 Civil Rights Act, as amended ("Title VII"). All requirements for coverage have been met.

Charging Party has been employed for 23 years as the only female carpenter in the Building Services Department. She commenced a medical leave of absence on March 19, 2004 and was subsequently terminated on July 22, 2005.

Charging Party asserts she was subjected to a hostile work environment based on her age (59) and sex (female), in violation on both the ADEA and Title VII of the Civil Rights Act of 1964, as amended. Charging Party asserts that her male counterparts, supervisor, and other respondent officials engaged in a series of actions to demean, humiliate, and intimidate her because she was the only female in the department. Charging Party further asserts that she complained to management about the treatment, but her complaints were not taken seriously, nor was there any action taken to stop the harassment. Charging Party claimed that because of her complaints, the respondent blamed her for problems occurring in the department.

Respondent denies the allegations and contend that only one complaint was received by the Charging Party which was amicably resolved. Respondent asserted that the Charging Party engaged in threatening behavioral toward her co-workers and was written-up for insubordinate conduct toward her supervisor. Respondent further claims that the Charging Party was subsequently terminated because she was unable to return from work her long term medical leave of absence. Respondent states that the Charging Party was replaced by a male.

Examination of the evidence revealed that the Charging Party did complain to the Respondent management officials as well as her union on more than one occasion about her treatment in her department and was advised to file a complaint with Employee Relations.

The record further supports Charging Party's allegations that she was singled out for differential treatment because of her sex with respect to unjust disciplinary actions, lack of support by management officials and alienation by her male counterparts.

Based on this analysis, there is sufficient evidence to show that Charging Party was discriminated against on the basis of her sex, in violation of Title VII. We further conclude that the Charging Party's medical condition and subsequent long term medical leave of absence was the direct result of the ongoing hostile work environment within the department. There is insufficient evidence to support her claim of age discrimination.

Title VII requires that, if the Commission determines that there is reason to believe that a violation has occurred, it shall endeavor to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, persuasion. Having determined that there is reason to believe that a violation has occurred, the Commission now invites the parties to join with it in a collective effort toward a just resolution of this matter.

This Letter of Determination serves as notice that EEOC is prepared to begin the conciliation process. Disclosure of the information obtained by the Commission during the conciliation process will be governed by Section 1601.26 of the Commission's Procedural Regulations. When the Respondent declines to enter into settlement discussions, or if the Commission's representative, for any other reason, is unable to secure a settlement acceptable to the Office Director, the Director shall so inform the Respondent in writing and advise it of the court enforcement alternative available to the Commission.

Respondent is reminded that federal law prohibits retaliation against persons who have exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in a Commission investigation is also prohibited. These protections apply regardless of the Commission's determination on the merits of the charge.

ON BEHALF OF THE COMMISSION:

NOV 0 6 2006
_____
Date

_____
Spencer H. Lewis, Jr.
District Director

Exhibit B

EEOC Form 161-A (10/96)                    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE
*(CONCILIATION FAILURE)*

| | |
|---|---|
| To: Ms. Elena Schiano<br>491 Eltingville Blvd.<br>Staten Island, NY 10312 | From: Spencer H. Lewis, Jr, District Director<br>Equal Employment Opportunity Commission<br>New York District Office<br>33 Whitehall Street, 5th Floor<br>New York, New York 10004-2112 |

☐    ☐    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 160-2005-00976 | Hazel C. Stewart, Supervisor | 212-336-3776 |

This Notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> from your receipt of this Notice**; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____                        4/20/2007
Spencer H. Lewis, Jr., District Director                        *(Date Mailed)*

Enclosure(s)

c.    Respondent(s):

Tanya L. Menton, V.P.
Litigation & Employment Practices
ABC, Inc.
77 West 66 Street
New York, New York 10023-6298

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------- x

ELENA SCHIANO,

                           Plaintiff,

— against —

ABC, INC., and WALTER VAZQUEZ, individually,

                         Defendants.

----------------------------------------- x

**FIRST AMENDED COMPLAINT**

# FIRST AMENDED COMPLAINT

From:

    SACK & SACK, ESQS.
    Jonathan Sack, Esq.
    110 East 59th Street, 19th Floor
    New York, New York 10022-2050
    Tel: (212) 702-9000
    Fax: (212) 702-9702
    Attorneys for Plaintiff